## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

KEVIN GUBBELS and INSURE MY
HONEY, INC.,

                Plaintiffs,

vs.

SONNY PERDUE, in his capacity as
Secretary of the United States
Department of Agriculture, UNITED
STATES DEPARTMENT OF
AGRICULTURE, MARTIN R.
BARBRE, in his capacity as
Administrator of the United States
Risk Management Agency, and
UNITED STATES RISK
MANAGEMENT AGENCY,

                Defendants.

4:20-CV-3060

MEMORANDUM AND ORDER

      The plaintiffs' complaint seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 & 2202, regarding plaintiff Kevin Gubbels' temporary suspension from participating in the sale and servicing of United States Department of Agriculture's (USDA) federal crop insurance. Filing 1 at 2-3. The plaintiffs also seek a preliminary injunction aimed at vacating the Notice of Suspension and Proposed Debarment issued by defendant Risk Management Agency (RMA), and its Administrator, defendant Martin Barbre. The defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction, and for summary judgment pursuant to Fed. R. Civ. P. 56, regarding the plaintiffs' asserted constitutional claims. Filing 16. For the reasons that follow, the Court finds that the plaintiffs' claims should be dismissed, and request for a preliminary injunction denied as moot.

## I. STANDARD OF REVIEW

The relevant considerations for the issuance of a preliminary injunction are: (1) the threat of irreparable harm to the movant; (2) the state of balance between the alleged harm and the injury that granting the injunction will inflict on other party litigants; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) (en banc). Although generally, no one factor is determinative, the absence of a likelihood of success on the merits suggests that preliminary injunctive relief should be denied. *D.M. by Bao Xiong v. Minn. State High Sch. League,* 917 F.3d 994, 999 (8th Cir. 2019).

A motion pursuant to Fed. R. Civ. P. 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA,* 615 F.3d 985, 988 (8th Cir. 2010). The court has substantial authority to determine whether it has jurisdiction. *Osborn v. United States,* 918 F.2d 724, 730 (8th Cir. 1990).

A Rule 12(b)(1) motion can be presented as either a "facial" or "factual" challenge. *Osborn,* 918 F.2d at 729 n.6. When reviewing a facial challenge, the court restricts itself to the face of the pleadings, and the nonmovant receives the same protections as it would facing a Rule 12(b)(6) motion. *Id.* When reviewing a factual challenge, the court considers matters outside the pleadings, and the nonmovant does not receive the benefit of Rule 12(b)(6) safeguards. *Id.* Unlike a motion for summary judgment, the court is free to resolve disputed issues of fact, *Jessie v. Potter,* 516 F.3d 709, 712 (8th Cir. 2008). This case presents a factual challenge.

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to

judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id*. But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id*.

In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

Review of an agency's decision concerns whether it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Review of an agency action alleged to violate the Constitution is *de novo*. *Business Commc'ns, Inc. v. U.S. Dept. of Educ.*, 739 F.3d 374, 379 (8th Cir. 2013).

## II. BACKGROUND

In 1938, the Federal Crop Insurance Act (FCIA) established a crop insurance regime to be administered and regulated by the Federal Crop Insurance Corporation (FCIC). 7 U.S.C. § 1503. In 1980, the FCIA was revised to require the FCIC, "to the maximum extent possible," to encourage the sale

of federal crop insurance through licensed private insurance agents and brokers. 7 U.S.C. § 1507(c). The FCIC was to reimburse the private insurance entities for administrative costs and program expenses, and provide reinsurance to cover catastrophic losses. *Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 440 F.3d 992, 994 (8th Cir. 2006). The FCIC requires an approved insurance provider (AIP) to sign a standard reinsurance agreement (SRA), which authorized the AIP to sell and service federal crop insurance policies, and obligated the FCIC to reinsure all such policies if written on terms approved by the FCIC. *Am. Growers Ins., Co. v. Fed. Crop Ins. Corp.*, 532 F.3d 797, 798 (8th Cir. 2008). In 1996, Congress created the USDA Risk Management Agency (RMA) to operate and manage the FCIC. *Id.*

Kevin Gubbels is a crop insurance agent and the owner of two crop insurance entities, one of which is plaintiff Insure My Honey, Inc. Filing 1 at 4. For the 2020 reinsurance year, Gubbels was an agent for five APIs, and through Insure My Honey, had several independent contractor subagents who issued or renewed crop insurance policies. Filing 23 at 2. On December 3, 2019, Gubbels made a presentation regarding federal crop insurance programs to a group of producers at a Farm Bureau meeting in Imperial County, California. Filing 19 at 3.

An email advertising Gubbels' presentation reported that an agent from Insure My Forage[1] will discuss federal crop insurance for alfalfa. Filing 19 at 4. Further, the email purported that Gubbels would make certain representations regarding crop insurance in terms of return on investment, and profit over premium cost. The email also noted that the application deadline for the current crop insurance program was December 6.

---

[1] Insure My Forage is the d/b/a for Insure My Honey. Filing 19 at 2.

The email advertising Gubbels' presentation was forwarded to Heather Manzano, Deputy Administrator for Compliance for the RMA. Filing 18-1 at 5. Certain representations in the email concerned Manzano. Filing 18-1 at 6. First, the deadline for producers to submit their application for the Pasture, Rangeland, Forage (PRF) crop insurance program had already passed. The sales closing date for all agents was November 15, but the forwarded email represented that the deadline for the program was December 6.[2] Additionally, Manzano was concerned that the representations attributed to Gubbels regarding return on investment and profit over premium cost mischaracterized the Federal Crop Insurance Program (FCIP) and inaccurately marketed federal crop insurance policies as an investment or profit-generating tool, rather than as a risk management tool. Filing 18-1 at 7.

Manzano and the regional compliance officer, Sandy Sanchez, investigated further and learned from a USDA employee in attendance at Gubbels' presentation that, according to the employee, Gubbels did represent in his presentation that the application deadline for the PRF program was December 6. Filing 18-1 at 8. The employee also relayed that Gubbels told the attendees that the PRF program was available for land already insured under a different federal crop insurance program. Manzano considered this aspect of Gubbels' purported presentation to be false because policyholders are specifically prohibited from double-insuring a crop under separate insurance plans. Id. Manzano found Gubbels' reported representations regarding the sales closing date, federal crop insurance as an investment or profit-generating

---

[2] For 2020 policies, the sales closing date for agents was November 15, 2019. Agents were required to submit policy applications to an API by December 9, and the API deadline for processing applications to the RMA was December 15. Filing 1 at 4.

tool, and double-insuring one crop, to be severe misrepresentations, and felt it necessary to suspend Gubbels from participating in the FCIP. *Id.*

In February, Manzano recommended to Martin Barbre, Administrator of the RMA and Manager of the FCIC, that he issue a Notice of Suspension and Proposed Debarment. Filing 18-1 at 10. Barbre agreed, and issued the recommended Notice on February 21, 2020, which informed Gubbels that he was suspended from participation in programs of the United States effective immediately. Filing 7-3 at 15. The Notice also informed Gubbels that Barbre was proposing to debar him for up to three years from participating in such programs. *Id.* The suspension was for a temporary period, pending completion of the debarment proceedings. Filing 7-3 at 17. Gubbels was advised that he had thirty days from the date he received the Notice to contest his suspension and proposed debarment. Filing 7-3 at 15.

The text of the Notice informed Gubbels that Barbre's decision to suspend him was based both on the email advertising Gubbels' presentation, as well as from interviews with individuals who attended the meeting. Filing 7-3 at 16. According to Barbre, a federal agency may debar a person for violating a public agreement, and Gubbels had violated § IV(h)(2) of the SRA, which required him to comply with FCIC procedures. Gubbels' failure to comply with FCIC procedures, in Barbre's view, concerned his three purported misrepresentations. Filing 7-3 at 16-17. First, Gubbels misrepresented the PRF application deadline as December 6, which was three weeks later than the actual deadline. Filing 7-3 at 17. This kind of misrepresentation, according to Barbre, triggers backdating of applications and gave Gubbels an unfair advantage over agents who had complied with the application deadline. Second, Barbre found that Gubbels misrepresented FCIC policy and procedures by claiming that producers may double-insure their alfalfa crop

6

through yield protection and rainfall index protection. Third, Barbre found that Gubbels misrepresented the FCIP as an investment scheme, instead of a risk management tool. *Id*.

Through counsel, Gubbels responded to Barbre's Notice with a sworn declaration, dated March 11, 2020. Filing 7-3 at 6-9. After first introducing himself and providing some background information about how he got involved with selling crop insurance, Gubbels addressed the substantive allegations in the Notice. First, he admitted that he made a mistake in accepting policies after the 2020 PRF sales closing date. Filing 7-3 at 7. Gubbels, however, represented that he did not accept late applications in order to get an unfair advantage over his competition, nor did he believe accepting late applications gave him an advantage. Based on his experience, he believed that accepting late applications was "standard practice used by the vast majority" of his competitors. Filing 7-3 at 8. Because he "keyed into the system" all applications before the December 15 deadline for AIPs to submit applications to the RMA, he did not believe the applications were materially misleading.

Second, Gubbels believed the allegation that he had claimed producers could double-insure their alfalfa crop through yield protection and rainfall index protection was based on confusion about what had actually been said at the meeting. Filing 7-3 at 8. Gubbels reported that in addition to the PRF program, other crop insurance programs were also discussed, including the Multiple Peril Crop Insurance Forage Production program. When discussing the Forage Production program, several producers mentioned that they had never collected on the coverage despite several years of drought conditions. Gubbels said he suggested the PRF program could be a superior way of insuring their acreage. He did not believe he said that a producer could

7

participate in both programs, but did not exclude the possibility that he misspoke while discussing both programs. Filing 7-3 at 8.

Regarding the third allegation, Gubbels admitted that he spoke with Ronald Leimgruber, who was setting up the Imperial Valley Meeting, and told him the PRF program had paid out in California eight out of ten years, and also stated that the program had yielded a profit over premium cost of $3.60 per acre over the last twenty years. Filing 7-3 at 9. Gubbels believed that Leimgruber, or someone working for him, used this information to create the email that advertised Gubbels' presentation. Gubbels, however, did not review the email before it went out. Gubbels said he was not aware of any RMA regulation or guidance that prohibited him from describing the program the way he did. Further, what Gubbels told Leimgruber was not intended to mischaracterize the FCIP, or to represent the program as something other than a safety net for producers when they faced lean years.

Accompanying Gubbels' declaration was a letter from his counsel, Chris Davis. Davis reiterated Gubbels' explanation that two of the allegations were either misunderstandings about what was said, or Gubbels' inartful description of the program made by someone with a farming background, not someone with a formal business education. Filing 18-1 at 221-22. Davis acknowledged—as did Gubbels—that Gubbels impermissibly submitted applications after the sales closing date. Filing 18-1 at 222. But, to ensure that this would not happen again, Davis represented that he was working with Gubbels to implement compliance procedures, and cooperating with the RMA to resolve the investigation. Finally, Davis argued that on these facts, and given Gubbels' cooperation and implementation of remedial measures to ensure that this does not happen again, suspension and debarment are

8

inappropriate. Filing 18-1 at 223-24. Davis requested a hearing with Barbre in Washington, D.C. Filing 18-1 at 219.

On March 13, Barbre sent a clarification letter to Gubbels, explaining that the Notice excluded him, both as a participant and as a principal, in covered transactions. Filing 18-1 at 242. According to Barbre, by extension, Gubbels' ownership and control of Insure My Honey and another crop insurance entity precluded these two entities from issuing or renewing any crop insurance policies during Gubbels' suspension.

An informal pre-hearing conference was held on March 25, 2020. Filing 19 at 9, filing 18-1 at 243-83. In attendance (presumably all by telephone) were Barbre, Davis, and Manzano. Also in attendance were other RMA and USDA employees involved in the investigation. Barbre opened the proceeding by stating that the purpose of the conference was to give Davis the opportunity to present additional background facts, verify facts still in dispute, propose a way forward, and answer any questions that Barbre may have. Filing 18-1 at 244. Barbre emphasized that the investigation of Gubbels was not complete, and it was too early for him to make any decisions about specific terms of a proposed compliance agreement. Filing 18-1 at 245.

Davis was then given the floor. He said that he wanted to stress a couple of points that he had made in his March 11 letter, and then propose a way forward. Regarding the sales closing date issue, Davis said that colloquially, the sales closing date is referred to as the "longest day in the industry because it goes on for 30 days" due to the fact that the applications have to be keyed in well after the sales closing date. Filing 18-1 at 251. Essentially, Davis argued that backdating of policies sold after the sales closing date was common, and that the sales closing date was merely a "technical deadline, not a substantive deadline." Filing 18-1 at 253. Barbre was quick to disagree. He found the fact

9

that Gubbels was advertising for sales past the sales closing date to be "egregious." Filing 18-1 at 255.

Davis repeated that Gubbels was not a sophisticated guy, and that in explaining the PRF program to the producers, he did not intend to characterize the program as a scheme or profit opportunity. Barbre responded that it was the regulation he has allegedly violated—talking to people about selling policies after the sales closing date—that is the issue. If the representations he purportedly made about the program as a profit opportunity had occurred before the sales closing date, "we wouldn't be having this conversation." Filing 18-1 at 261.

Turning to how to go forward, Davis said that Gubbels acknowledges he made a mistake with regard to the sales closing date, and he would be willing to pay a meaningful fine, but that suspension wasn't warranted on these facts. Barbre indicated that they would need some time to finish their investigation, and thought "with everything going on in our country right now" (likely a reference to COVID-19), nothing was going to happen, for or against Gubbels, in the next 45 to 60 days. Filing 18-1 at 271-72. Davis closed by acknowledging that Barbre and his team were not willing to talk specifics yet, but wanted to make it clear that Gubbels was willing to talk about remedies, including a monetary fine, a limited suspension, and some compliance directives regarding the appropriate terminology to use in his presentations. Filing 18-1 at 282.

On April 2, with Davis' consent, Gubbels sent Barbre a letter and video, in which he attempted to explain his actions, and inform Barbre of his current circumstances, such as the enormous emotional strain and mental stress he and his family are under while the investigation—and his suspension—continue, and how his physical health has been adversely affected. Gubbels implored Barbre to consider his proposal for resolving the matter, which

included accepting a $10,000 fine, agreeing to only work for an agency where there would be oversight, taking ethics training, and not enrolling any new customers in PRF or Apiculture programs for three years. Filing 18-1 at 291-93. Barbre told Davis he would read Gubbels' letter and watch the accompanying video, but stated he did not want to make any further comment until the compliance office had finished its investigation. Filing 7-3 at 44. There is an indication in the record that Barbre may have later responded to Gubbels' letter, but if so, the actual response, or a description of what was written or said, is not part of this record.

On May 14, Davis sent an email to Manzano, looking to follow up on the status of the investigation. Filing 18-1 at 297-99. Davis provided additional information on the toll the suspension has taken on Gubbels' business, as well as his health and well-being. He asked to know where the investigation stood, and hoped that it could be expedited. For the most part, Davis, repeated the settlement Gubbels proposed in his April 2 letter, and argued that this proposed settlement would send a strong message of deterrence. Manzano replied on May 18, stating: "RMA's 'review is complete and the information has been shared with the Office of Inspector General and the Nebraska US Attorney's Office. We are currently awaiting their guidance on whether or not the US Attorney's Office is accepting the case." Filing 18-1 at 296.

Within a matter of hours, Davis replied to Manzano's news that Gubbels' case had been referred to the United States Attorney's Office. He expressed his disappointment that "the RMA appears to want to make this into a criminal matter when we've tried to have an open dialogue with you," and took issue with the referral by describing Gubbels' situation as "a purely civil/administrative compliance matter." Filing 18-1 at 295. Relying on

Manzano's statement that the RMA's review is complete, Davis asked if they could know, and have an opportunity to discuss, the findings.

Manzano responded the next day, May 19, and informed Davis that the RMA was required to "report all potential fraud to the Office of Inspector General," but also stated that they would be happy to have another discussion with him about Gubbels once they know whether or not the United States Attorney is going to accept the case. Manzano also provided the name and contact information for the USDA special agent investigating Gubbels' case for the Inspector General. Filing 18-1 at 294-95. On June 1, before another discussion was arranged, Gubbels filed his federal district court complaint. Filing 1.

## III. DISCUSSION

### 1. MOTION TO DISMISS ON JURISDICTION

The plaintiffs' three-count complaint alleges in count one that the administrative decision to suspend Gubbels from participation in the FCIP and propose his debarment was arbitrary and capricious because the RMA failed to adhere to its own regulations. The plaintiffs allege that, contrary to the pertinent regulations, (1) they did not receive adequate notice of the basis for the defendants' decision, (2) no evidentiary hearing was held before the decision was issued, (3) a written decision was not received within the time limits required by the regulations, and (4) a failure to abide by other limits specified in the regulations. Filing 1 at 9-10. The defendants have moved for dismissal of the plaintiffs' claims regarding the administrative action on jurisdictional grounds, arguing that the plaintiffs' claims are not ripe, and that the plaintiffs have failed to exhaust the administrative process before bringing this action. Filing 19 at 16.

Actions seeking declaratory or injunctive relief regarding an agency's decision are subject to an implicit limitation because review of such actions is discretionary. *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57 (1993). The judicially created doctrine of ripeness concerns the Article III requirement of case and controversy, as well as prudential considerations, for a court to refuse to exercise its jurisdiction. *Iowa League of Cities v. E.P.A.*, 711 F.3d 844 (8th Cir. 2013). A court should be reluctant to intervene in a matter unless it is in the context of a controversy ripe for judicial resolution. *Lane v. United States Dept. of Agric.,* 187 F.3d 793, 795 (8th Cir. 1999).

In the context of the review of an administrative action, the factors to consider in determining whether a matter is ripe for judicial relief are whether (1) the issues presented are purely legal, (2) the issues are based on a final agency action, (3) the controversy has a direct and immediate impact on the plaintiffs' business, and (4) the litigation is calculated to expedite final resolution rather than delay or impede effective agency enforcement. *Id.* The defendants argue that the plaintiffs' claim regarding the administrative proceeding is not ripe because the issues are not based on a final agency action. Filing 19 at 16-20. The Court agrees.

A final agency action for which there is no other adequate remedy in a court is subject to judicial review, and a preliminary, procedural, or intermediate agency action or ruling, not directly reviewable, is subject to review on review of the final agency action. 5 U.S.C. § 704. An agency's action is final only when it is *both* the consummation of the agency's decision-making process *and* a decision by which rights or obligations have been determined or from which legal consequences flow. *Sierra Club v. Army Corps of Engineers,* 446 F.3d 808, 813 (8th Cir. 2006); *National Min. Ass'n v. McCarthy,* 758 F.3d 243, 250 (D.C. Cir. 2014).

13

The RMA action affecting the plaintiffs is Gubbels' suspension from participating in the FCIP. The Notice informing Gubbels of the suspension plainly identifies that the "suspension is for a temporary period, pending completion of the debarment proceedings." Filing 7-3 at 17. In fact, the regulations required the Notice to advise Gubbels that his suspension was temporary pending completion of an investigation or debarment proceeding. 2 C.F.R. § 180.715(e). Although Manzano, in her May 18 email to Davis, reported that the RMA's review was complete, she also reported that the information collected in that review had been forwarded to the Office of Inspector General and the United States Attorney for the District of Nebraska, and that the RMA was awaiting their guidance. Filing 18-1 at 296.

The regulations provide that if legal or debarment proceedings are initiated at the time of, or during a suspension, the suspension "may continue until the conclusion of those proceedings." 2 C.F.R. § 180.760(a). Nothing in this record indicates that either the Inspector General or United States Attorney has completed their review and advised the RMA accordingly. The evidence shows that there has not been a consummation of the RMA's decision-making process such that the plaintiffs' suspension could be deemed a final agency action.

The plaintiffs' argument in response focuses on the direct and immediate impact that the suspension has had on Gubbels' business. The plaintiffs argue that there "is nothing hypothetical about the consequences of their suspension order," and assert that the suspension has cost Gubbels and his insurance entities at least $1.6 million in lost business to date. Filing 23 at 15. The Court understands and is concerned about the consequences of the suspension and the affect it has had on Gubbels. But the evidence demonstrates that during the administrative proceedings, Gubbels admitted violating the sales closing

14

date. Although he has made several settlement proposals to resolve his admitted violation, as well as address the RMA's other concerns, the RMA has apparently declined to substantively respond with a settlement proposal of its own—which is its right under the regulations. A federal agency may settle a debarment or suspension action at any time if it is in the best interests of the Federal Government. 2 C.F.R. § 180.635.

Both as a matter of Article III case and controversy, as well as prudential considerations, this Court declines to exercise its jurisdiction in the plaintiffs' ongoing administrative proceedings. The RMA has the right under the regulations to refer its investigative findings to the United States Attorney and Office of the Inspector General for further consideration.[3] The RMA also has the right to end the plaintiffs' suspension with a settlement, but only if the RMA determines that doing so is in the best interests of the Federal Government. 2 C.F.R. § 180.635. The Court declines to exercise its jurisdiction in an ongoing administrative action awaiting further investigation and review by the United States Attorney or Inspector General where one of the allegations supporting suspension has been admitted, notwithstanding Gubbels' efforts, seemingly made in good faith, to suffer significant personal consequences in hopes of bringing his suspension and proposed debarment to an end.

### 2. SUMMARY JUDGMENT ON PLAINTIFFS' CONSTITUTIONAL CLAIMS

The plaintiffs assert two related, Fifth Amendment due process claims: that the RMA failed to comply with its own regulations, and the RMA's process

---

[3] Manzano advised Davis that the RMA was *required* to report all potential fraud to the Office of Inspector General. Filing 18-1 at 294. A citation or reference for this requirement was not disclosed.

itself failed to comport with the requirements for due process. Filing 1 at 10-12. The specific allegations in support of the plaintiffs' constitutional claims are the same as those alleged for the plaintiffs' administrative procedures claim: (1) lack of adequate notice, (2) no evidentiary hearing, (3) no written decision within the time limits in the regulations, and (4) failure to abide by other regulation limits. Filing 1 at 9-10. The defendants assert and argue that the plaintiffs' constitutional claims are predicated on a fundamental misunderstanding of the proper applications of the regulations and guidance pertaining to nonprocurement suspension and debarment actions, and should be dismissed as a matter of law. Filing 19 at 22. The Court finds the defendants' arguments persuasive.

As a preliminary consideration, having determined that the plaintiffs' administrative claim was not ripe, the Court did not consider the defendants' alternate argument regarding the plaintiffs' failure to exhaust the administrative process. In general, if a dispute is one over which an agency of the USDA has jurisdiction, then the administrative remedies and appeals must first be exhausted. 7 U.S.C. § 6912(e); 7 C.F.R. § 400.453. Exhaustion, however, is presumed to be non-jurisdictional absent Congress' clear, unequivocal terms expressing that the judiciary is barred from hearing an action until the administrative agency has reached a decision. *Ace Property & Cas. Ins. Co. v. Federal Crop Ins. Corp.,* 440 F.3d 992, 997 (8th Cir. 2006). Here, exhaustion of all administrative appeals is non-jurisdictional. *Id.* at 999.

But even though non-jurisdictional, exhaustion of administrative remedies is still a requirement—that is, unless administrative exhaustion is excused. A party may be excused from exhausting all administrative remedies if (1) the party's claim involves a legitimate constitutional question, (2) exhaustion would cause irreparable harm, (3) further administrative

16

procedures would be futile, or (4) the issues to be decided are primarily legal rather than factual. *Id.* at 1000. Here, the plaintiffs have alleged legitimate constitutional questions regarding due process.

There is no dispute that the plaintiffs are entitled to due process regarding the decision to suspend Gubbels from participating in FCIC programs. "Once it is determined that due process applies, the question is what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Consideration of the process due is flexible and will vary depending on the circumstances, but must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895 (1961).

Turning to the due process claims raised in the complaint, the plaintiffs assert that they did not receive adequate notice of the basis for Gubbels' suspension and his proposed debarment as required by the regulations. Filing 1 at 11-12. Principles of due process requires that the recipient have timely and adequate notice, reasonably calculated to apprise the recipient of the pendency of the action, and afford the recipient the opportunity to prepare and present objections in response. *Bliek v. Palmer*, 102 F.3d 1472, 1475 (8th Cir. 1997).

Regarding Gubbels' suspension, the regulations provide that the notice of suspension must advise the plaintiffs that suspension was based on adequate evidence that irregularities were committed which seriously reflect on the propriety of further federal government dealings with the plaintiffs, or other irregularities in terms sufficient to put the plaintiffs on notice. 2 C.F.R. § 180.715(b)(3) & (c). Similarly, the regulations regarding a proposed debarment, in pertinent part, provide that the notice must advise the plaintiffs

of the reasons for proposing debarment in terms sufficient to put the plaintiffs on notice of the conduct at issue, and the causes under 2 C.F.R. § 180.800 relied on for proposing debarment. 2 C.F.R. § 180.805. These regulatory requirements are consistent with the due process requirements for adequate notice.

Here, Barbre's Notice adequately described the conduct and irregularities that he concluded necessitated Gubbels' suspension, and identified that Gubbels' alleged misrepresentations violated FCIC procedures and breached the terms of the SRA. Filing 7-3 at 2-3. Also identified was the basis for Gubbels' proposed debarment—that his misrepresentations were a willful violation of a requirement of a public agreement so serious as to affect the integrity of an agency program pursuant to 2 C.F.R. § 180.800(b)(3). Filing 7-3 at 3.

Prior to filing this action, Gubbels, and his counsel Davis, were able to substantively respond to the allegations regarding Gubbels' purported misrepresentations made in the Notice—Davis at the informal prehearing conference, and Gubbels in his later written submission and video sent to Barbre. Filing 18-1 at 243-93. Now, Gubbels argues that the RMA has not identified a "regulatory basis" for one ground of suspension—that being, the allegation that Gubbels touted the PRF program as an investment strategy instead of a risk management tool. Filing 23 at 25. The plaintiffs' argument in this regard isn't that they are unable to prepare and present objections in response. Quite the opposite, the plaintiffs, both at the administrative level and here, have presented their objection in clear terms. They have argued that Gubbels was merely inarticulate in explaining the PRF program, and in no way intended to represent it as something other than a risk management tool. The Court finds that the plaintiffs' claim regarding inadequate notice to be without merit. The plaintiffs received sufficient notification regarding each of

the three alleged violations reasonably calculated to apprise the plaintiffs of the pendency of the agency's action, and afford the plaintiffs the opportunity to prepare and present objections in response.

The plaintiffs' assertion that they were entitled to an evidentiary hearing on Gubbels' suspension pursuant to the regulations is accurate in part, but the assertion that they are entitled to a hearing on demand is without support. The notice of suspension informed Gubbels that he had thirty days from the date he received the notice to contest his suspension and proposed debarment. Filing 7-3 at 1. This advisement is consistent with the regulations. A party wishing to contest a suspension must provide the suspending official with opposing information, and may do so orally or in writing, but information provided orally must also be submitted in writing for the official record. 2 C.F.R. § 180.720. Gubbels, of course, did contest his suspension and proposed debarment within the 30-day window identified in the Notice. Filing 7-3 at 24-29.

The defendants agree that Gubbels is entitled to, and will be afforded, an evidentiary hearing, but not until the matters pending before the Inspector General and United States Attorney have been addressed. Filing 19 at 25. The regulations provide that a respondent will have an opportunity to challenge the facts supporting the suspension if the respondent's presentation in opposition raises a genuine dispute over facts material to the suspension. 2 C.F.R. § 180.735(b)(2). Suspension proceedings are to be conducted in a fair and informal manner, with the suspending official using flexible procedures to allow the presentation of matters in opposition. 2 C.F.R. § 180.740. The respondent may present witnesses, and confront opposing witnesses, as well as present other evidence in support. 2 C.F.R. § 180.745.

The plaintiffs' argument in response, however, does not focus so much on the procedures, as it does on the timing of the proceeding. The plaintiffs point to the regulation requiring the suspending official to make a written decision whether to continue, modify, or terminate a suspension within 45 days of the closing of the official record, and argue, that at the latest, the official record closed on April 2—the date of Davis' email to Barbre advising him that Gubbels would be sending a letter and video for Barbre to consider. Filing 23 at 28. The implication in the plaintiffs' argument is that the plaintiffs were entitled, both pursuant to the regulations and as a matter of due process, to an evidentiary hearing on the suspension sometime before the 45-day deadline for the required issuance of a written decision—or perhaps, notice and a hearing pre-suspension as a matter of due process.

One flaw in the plaintiffs' argument, however, is the assertion that the official record is now closed, and has been closed since April 2. The defendants have repeatedly maintained that they were either continuing with their investigation, or waiting to hear whether the United States Attorney will accept the case on a fraud referral. Filing 7-3 at 44; filing 18-1 at 294-95. The plaintiffs do not have the option of unilaterally directing the RMA to close its investigation. The regulations provide that the official record closes upon the suspending official's receipt of final submissions, information, and findings of fact. 2 C.F.R. §§ 180.755 & 417.755. The respondent's last submission does not dictate the closing of the official record.

Further, the regulations provide that if legal or debarment proceedings are initiated at the time of, or during a suspension, the suspension may continue until the conclusion of those proceedings. 2 C.F.R. § 180.760(a). Thus, the plaintiffs' attempt to draw a distinction between a suspension investigation and a debarment investigation fails to apprehend that the regulations

specifically allow for the continuation of a suspension during the course of a debarment proceeding.

It is true that in most, but not all cases, some type of pre-deprivation notice and hearing are constitutionally required before invading a property interest. *Lunon v. Botsford*, 946 F.3d 425, 430-31 (8th Cir. 2019); *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998). Relevant factors for considering the process due include the affected private interest, the risk of an erroneous deprivation, the probable value of additional procedural safeguards, and the government's interest, including burdens that additional safeguards would entail. *Parrish*, 133 F.3d at 615. Here, however, the risk of an erroneous deprivation and the value of additional safeguards are obviated by the fact that Gubbels admitted his violation regarding the sales closing date. The RMA's interest in consistently enforcing sales closing dates is high, as Barbre described in the Notice. Filing 7-3 at 17. The Court also observes that the post-deprivation procedures, as discussed above, for addressing both alleged and admitted violations, comports with the requirements of due process.

The Court is not unsympathetic to Gubbels' point of view. He has made substantial offers to settle the agency's allegations so that he could move forward. Barbre has not rejected Gubbels' settlement offers, but has declined to consider settlement without first hearing from the United States Attorney or the Inspector General. Barbre is within his rights under the regulations, and is not acting inconsistent with the requirements of due process. *But, the Court will note—it's time for a decision.*

Regarding Insure My Honey, the plaintiffs argue that it did not receive a separate notice of suspension and proposed debarment, which presumably, although not specifically articulated, violates Insure My Honey's due process right to adequate notice and opportunity to be heard. Filing 23 at 29. However, the notice of suspension (filing 7-3 at 15-18), as well as Barbre's follow-up

explanatory letter (filing 18-1 at 242), does not purport to suspend or debar Insure My Honey. Instead, the notice of suspension informed Gubbels that he was immediately suspended from participating, either as a participant or principal, in covered transactions under the United States non-procurement and procurement programs through the executive branch of the United States Government. Filing 7-3 at 17. Barbre's follow-up letter further identified that Gubbels' ownership of Insure My Honey and another crop insurance entity qualified him as the principal[4] of both entities, and by extension, both entities may not participate in covered transactions under federal programs. Filing 18-1 at 242.

In other words, the entities were not suspended—Gubbels was—and by extension, both entities in which he was the owner/principal were precluded from participating in the same kind of covered transactions as was Gubbels in his capacity as a participant. Similarly, the plaintiffs argue that the independent insurance agents who sell and service Insure My Honey policies were also suspended without notice when they were instructed that they may not issue or renew any crop insurance policies on behalf of Gubbels. Filing 23 at 29-30. The letter provided to the independent agents did not purport to suspend them. See filing 7-3 at 42. The independent agents were informed that Gubbels was suspended, and that they were precluded from issuing or renewing crop insurance policies on Gubbels' behalf, but were allowed to issue and renew crop insurance policies under another insurance agency not associated with Gubbels. The plaintiffs' claim that Insure My Honey and the

---

[4] In pertinent part, a principal is defined as an "officer, director, owner, partner, principal investigator, or other person within a participant with management or supervisory responsibilities related to a covered transaction." 2 C.F.R. § 180.995.

independent agents were somehow suspended in their own right, and not as an extension of Gubbels' suspension, is without merit.

Finally, in their brief, the plaintiffs allege that the adjudicatory structure of the suspension procedure deprives Gubbels of an impartial adjudicator. Barbre, according to the plaintiffs, cannot fairly be in charge of the investigation and prosecution, and yet be impartial in adjudicating Gubbels' suspension and proposed debarment. The Due Process Clause requires a fair and impartial tribunal; however, the process begins with a presumption that the tribunal decision-makers are honest and impartial. *Gordon v. Hansen*, 168 F.3d 1109, 1114 (8th Cir. 1999). Merely alleging that it is inherently unfair to combine the functions of investigation, prosecution, and adjudication under one administrator is not enough to constitute a denial of procedural due process. The plaintiffs argue that Barbre showed his partiality when, in responding to Davis' email, he wrote, "My problem isn't just the sales after SCD [sales closing date] but the way he has presented this program. Mr. Gubbels has made a grave error and I've got to figure out how to deal with it." Filing 7-3 at 44.

Contrary to the plaintiffs' argument, Barbre's statement merely reflects the undisputed facts in the record at that time. Gubbels had admitted that he misrepresented at the meeting that sales of PFR crop insurance policies could be made well after the sales closing date. This is an action that Barbre could fairly characterize as a grave error. Barbre's comment reflected the fact that he had to figure out how he should deal with Gubbels' admitted violation, as well as how he should deal with the allegations concerning Gubbels' descriptions of the insurance itself. This statement came at a time when Gubbels and Davis were trying to persuade Barbre to enter into a settlement— which the regulations allow. *See* 2 C.F.R. § 180.635.

23

Barbre's statement merely showed his concern that without further investigation and consideration, he could not determine whether settlement was in the best interest of the Federal Government, as required by § 180.635. Further, Barbre's statement—that he needed to figure out how to deal with it—shows that he had not yet made a final determination, and the possibility existed that his final determination, once the administrative record is closed and after a hearing has been held, would favor Gubbels.

The Court finds that the RMA has, to date, complied with the pertinent regulations, and that the regulatory scheme comports with the process due the plaintiffs as a matter of law. **But the Court iterates—it's time for a decision.*

## IV. CONCLUSION

The plaintiffs administrative claim is a controversy not ripe for judicial resolution and should be dismissed without prejudice. *See County of Mille Lacs v. Benjamin,* 361 F.3d 460, 464 (8th Cir. 2004). The plaintiffs' due process claims, based on the current record, are without merit and should be dismissed. The defendants' actions *to date* have conformed with the pertinent regulations, and those regulations comport with the requirements of due process. The plaintiffs' motion for a preliminary injunction should be denied as moot.

IT IS ORDERED:

1.     The defendants' motion to dismiss (filing 16) the plaintiffs' claims is granted.

2.     The plaintiffs' administrative claim (filing 1) is dismissed without prejudice.

24

3.      The plaintiffs' due process claims (filing 1) are dismissed.

4.      The plaintiffs' motion for a preliminary injunction (filing 6) is denied as moot.

5.      A separate judgment will be entered.

Dated this 23rd day of November 2020.

BY THE COURT:

John M. Gerrard
Chief United States District Judge